**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **HANOVER INSURANCE COMPANY** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12–1680** |
| **PLAQUEMINES PARISH GOVERNMENT** | **SECTION "H"(5)** |

## ORDER AND REASONS

Before the Court is a Motion for Appeal of Magistrate Judge Decision (Doc. 355). For the following reasons, the Motion is DENIED.

## BACKGROUND

In 2008, Defendant Plaquemines Parish ("the Parish") hired Catco General Contractors to construct a community center in Boothville, LA. Plaintiff Hanover Insurance Company issued a performance bond for the project. Due to several disputes regarding the quality of the completed work, the Parish refused to tender the final payment on the construction contract to Catco. Catco in turn

refused to pay certain subcontractors on the project. Those subcontractors filed claims with Hanover seeking amounts due on the subcontracts. Hanover then instituted the instant litigation claiming that the Parish wrongfully withheld the final payment from Catco, resulting in several hundred thousand dollars in various claims against Hanover.

On May 29, 2013, in response to Hanover's Complaint, the Parish asserted a counterclaim against Hanover and a third-party demand against Catco and several other entities who were allegedly involved in the design of the community center. The Parish's counterclaim and third-party demand allege that Catco failed to complete the construction according to specifications. On June 21, 2013, in response to the Parish's counterclaim, Hanover filed a third-party demand against several of the subcontractors involved in the construction of the community center.

These initial filings spawned an avalanche of litigation. There are now more than 90 pleadings and over 30 parties in this matter. Because of the complex nature of this case, deposition discovery has proceeded in phases. The first phase of depositions consisted of 22 individuals identified as "principal/key witnesses." During the course of these depositions, a dispute arose regarding several witnesses who are former employees of Catco and Seizer, Thompson, Brown, the principal architects on the project.

The dispute began during the deposition of Stuart Maginnis. Mr. Maginnis was the vice president of Catco at the time of the construction project at issue. In 2010, Mr. Maginnis left Catco and started his own construction

company. Prior to his deposition in this case, Mr. Maginnis met with counsel for Catco and Hanover to prepare for the deposition. At the deposition, Mr. Maginnis was asked to describe his conversations with counsel and to identify the documents showed to him by counsel in preparation for the deposition. Counsel for Catco and Hanover instructed him not to answer the questions, asserting attorney-client privilege. An identical dispute emerged during the deposition of Joseph Cavallo. Mr. Cavallo was employed by Seizer, Thompson, Brown as a construction administrator. At the time of the deposition, he was no longer employed by Seizer, Thompson, Brown. Like Mr. Maginnis, Mr. Cavallo met with counsel for his former employer prior to the deposition. When he was asked to describe his conversations with Seizer, Thompson, Brown's counsel he was instructed not to answer on the basis of attorney-client privilege. The Parish and Mayeux's A/C and Heating, Inc., one of Catco's subcontractors, filed motions to compel answers to the questions. The Magistrate Judge held that the conversations are privileged and denied the motions. The Parish appealed.

## LEGAL STANDARD

With the consent of the presiding district judge, a magistrate judge may adjudicate non-dispositive pre-trial motions.[1] A magistrate judge is afforded broad discretion in resolving such motions.[2] A party aggrieved by the magistrate judge's ruling may appeal to the district judge within fourteen days after service

---

[1] 28 U.S.C. § 636(b)(1)(A) (West 2014).

[2] *McCallon v. BP Am. Prod. Co.*, Nos. 05–0597, C/W 05–0700, 2006 WL 3246886, at *2 (E.D. La. Nov. 8, 2006).

of the ruling.[3] The district judge may reverse only upon a finding that the ruling is "clearly erroneous or contrary to law."[4] In order to meet this high standard, the district judge must be "left with a definite and firm conviction that a mistake has been committed."[5]

## LAW AND ANALYSIS

The question presented by this Motion is simple, even if the answer is not: are conversations between counsel for a corporation and the corporation's former employees entitled to the attorney-client privilege, and, if so, to what extent? Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." The parties agree, and the Court is convinced, that Louisiana law governs the resolution of this issue.

This Court is bound under *Erie* to apply the same law as would be applied by the Louisiana Supreme Court.[6] "If the Louisiana Supreme Court has not ruled on this issue, then this Court must make an '*Erie* guess' and determine as best it can what the Louisiana Supreme Court would decide."[7] "In making an *Erie* guess, [federal courts] defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state

---

[3] Fed. R. Civ. P. 72(a).

[4] 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

[5] *Yelton v. PHI, Inc.*, 284 F.R.D. 374, 376 (E.D. La. 2012).

[6] *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[7] *Id*. at 627.

would decide otherwise."[8] The Court's task is to "predict state law, not create or modify it."[9] With regard to evidentiary issues, Louisiana courts often consider federal law as persuasive authority, particularly in the absence of relevant Louisiana authority.[10]

Neither the Court nor the parties have been able to locate a reasoned decision issued by a Louisiana court addressing this issue. The only Louisiana appellate court to address this issue did so in a summary order. In *Turner v. Lowery*, the Louisiana Supreme Court issued an order that reads:

> [Writ] Granted. Judgment of the trial court is vacated and set aside. Relators' motion for protective order is granted, and a protective order is entered in their favor preventing any discovery regarding privileged communications between relators' corporate counsel and any former employees relating to the subject matter of this lawsuit. See *Upjohn Co. v. United States*, 449 U.S. 383, 402-03, 101 S.Ct. 677, 688-89, 66 L.Ed.2d 584 (Burger, C.J. concurring); *In re Allen*, 106 F.3d 582, 605-06 (4th Cir.1997).[11]

While the Louisiana Supreme Court's order in *Turner* is not binding precedent, it is persuasive authority and strongly influences this Court's *Erie* guess. Yet, in the absence of further explanation from the *Turner* Court, the

[8] *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010).

[9] *Id.*

[10] *See State v. Foret*, 628 So. 2d 1116, 1122 (La. 1993) (citing La. Code Evid. art. 102 cmt. a. ("[T]he adoption of this Code facilitates the movement towards a uniform national law of evidence. . . . Louisiana courts now have available a body of persuasive authority which may be instructive in interpreting the Louisiana Code.")).

[11] 703 So.2d 1, 1997 WL 681346 (La. 1997).

precise parameters of the decision are ambiguous. An examination of the cases cited in *Turner*, as well as the other federal cases on point, provides some guidance.

The seminal case on the existence of the privilege between corporate counsel and the employees of a corporation is the Supreme Court's decision in *Upjohn Company v. United States*.[12] The dispute in *Upjohn* began when independent accountants retained by Upjohn discovered that one of Upjohn's foreign subsidiaries had possibly paid illegal bribes to foreign government officials.[13] This information was brought to the attention of Gerard Thomas, Upjohn's Vice President, Secretary, and General Counsel.[14] In response to this report, and at the direction of Upjohn's board of directors, Mr. Thomas began an investigation into the reports.[15] As part of the investigation, Upjohn's chairman sent a letter to all of Upjohn's foreign managers.[16] The letter described the investigation and ordered all employees to fully cooperate with Mr. Thomas's investigation and to otherwise keep the investigation confidential.[17] The letter included a detailed questionnaire.[18] The completed questionnaires were sent directly to Mr. Thomas.[19] Mr. Thomas and another attorney ultimately

[12] 449 U.S. 383 (1981).

[13] *Id*. at 386.

[14] *Id*.

[15] *Id*.

[16] *Id*. at 386–87.

[17] *Id*.

[18] *Id*. at 387.

[19] *Id*.

interviewed all respondents and some 33 other employees as part of their investigation.[20] At the conclusion of the investigation, Upjohn voluntarily disclosed the questionable payments to the IRS and the SEC.[21] The IRS then subpoenaed, *inter alia*, the completed questionnaires and any notes or summaries of the interviews.[22] Upjohn refused to disclose the documents, invoking the attorney-client privilege.[23] The IRS sued to compel production and the matter eventually reached the Supreme Court.[24]

The Supreme Court held that the communications between Mr. Thomas and the Upjohn employees were privileged.[25] In reaching its conclusion, the Court noted that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."[26] In the corporate setting, the Court observed that "it will frequently be employees beyond the control group . . . who will possess the information needed by the corporation's lawyers." Thus, the Court reasoned that the extension of the privilege beyond the controlling officers was necessary to preserve a corporate attorney's ability to gather the information necessary to represent the

[20] *Id.*

[21] *Id.*

[22] *Id.* at 387–88.

[23] *Id.* at 388

[24] *Id.*

[25] *Id.* at 395.

[26] *Id.* at 390.

corporation.[27]

The Court also noted that several of the subpoenaed communications occurred with individuals who were no longer employed by Upjohn.[28] The Court, however, specifically declined to address whether the privilege also applied to the communications with the former employees.[29] Chief Justice Burger wrote a concurring opinion criticizing the Court's avoidance of the former employee question.[30] Chief Justice Burger believed that communications with former employees should be privileged under certain circumstances. Specifically, he stated that:

> [I]n my view the Court should make clear now that, as a general rule, a communication is privileged at least when, as here, an employee or former employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment. The attorney must be one authorized by the management to inquire into the subject and must be seeking information to assist counsel in performing any of the following functions: (a) evaluating whether the employee's conduct has bound or would bind the corporation; (b) assessing the legal consequences, if any, of that conduct; or (c) formulating appropriate legal responses to actions that have been or may be taken by others with regard to that conduct.[31]

[27] *Id.* at 392. Prior to *Upjohn*, several circuit courts had limited the privilege to communications between the controlling officers of the corporation and corporate counsel.

[28] *Id.* at 394 n.3.

[29] *Id.*

[30] *Id.* at 402.

[31] *Id.* at 402–03.

Since *Upjohn* was decided, a relatively small number of federal courts have considered whether to extend *Upjohn* to former employees. Indeed, only two circuit courts have addressed the issue. Both the Ninth and the Fourth Circuits adopted the Burger concurrence.[32] Additionally, it appears that every federal court to address the issue, with the exception of a single district court decision in 1985, has held that the privilege extends to former employees in certain contexts.[33] Thus, it is clear to this Court that *some* privilege exists between counsel for a corporation and former employees of the corporation. Indeed, the *Turner* Court's citation to the Burger concurrence leads this Court to believe that the Louisiana Supreme Court would recognize such a privilege.

In order to determine the extent of the privilege, this Court need not look beyond the second case cited by *Turner*—*In re Allen*.[34] *In re Allen* involved a

---

[32] *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 658 F.2d 1355, 1361 n.7 (9th Cir. 1981); *In re Allen*, 106 F.3d 582, 606 (4th Cir. 1997). The Parish contends that *In re Petroleum Products* only discusses the Burger concurrence in a footnote and that the discussion is dicta. However, assuming *arguendo*, that the adoption of the Burger concurrence in *In re Petroleum Products* was dicta, several subsequent Ninth Circuit decisions have applied it as the law of the circuit. *See, e.g.*, *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1493 (9th Cir. 1989); *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996). Thus, there can be no doubt that the Ninth Circuit has adopted the rationale of the Burger concurrence.

[33] *See Peralta v. Cendant Corp.*, 190 F.R.D. 38 (D. Conn. 1999) (holding that the privilege applied to former employees); *Infosystems, Inc. v. Ceridian Corp.*, 197 F.R.D. 303 (E.D. Mich. 2000) (same); *Surles v. Air France*, No. 00-5004, 2001 WL 815522 (S.D.N.Y. July 19, 2001) (same); *Wade Williams Distribution, Inc. v. Am. Broad. Companies, Inc.*, No. 00-5002, 2004 WL 1487702 (S.D.N.Y. June 30, 2004) (same); *Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co.*, 232 F.R.D. 103 (S.D.N.Y. 2005) (same); *Weber v. FUJIFILM Med. Sys., U.S.A.*, No. 10-401, 2011 WL 3163597 (D. Conn. July 27, 2011) (same). *But see Clark Equipment Co. v. Lift Parts Mfg. Co. Inc.*, No. 82-4585, 1985 WL 2917 (N.D. Ill. 1985) (refusing to extend *Upjohn* to former employees).

[34] 106 F.3d 582.

dispute between a political advocacy group called the Better Government Bureau ("BGB") and West Virginia's Attorney General, Darrell McGraw.[35] BGB was a for-profit corporation incorporated in Ohio that styled itself a government watchdog association.[36] When McGraw learned that BGB had targeted him for criticism, he contacted the West Virginia Secretary of State in an effort to prevent the BGB from registering to do business in West Virginia.[37] Eventually, McGraw ordered a staff member to formally reserve the name "Better Government Bureau" with the Secretary of State, thus preventing the BGB from registering to do business in West Virginia under its own name.[38] BGB responded by filing suit against McGraw and others, asserting various claims under § 1983 and the Lanham Act.[39] During the course of the litigation, BGB obtained an internal memo from an employee within McGraw's office that revealed McGraw had personally contacted the Secretary of State and asked him to prevent the BGB from registering in West Virginia.[40] After the memo was leaked, McGraw's office retained outside counsel, Ms. Barbara Allen, to investigate the circumstances surrounding the leak.[41]

During the course of her investigation, Ms. Allen interviewed several

[35] *Id*. at 587.

[36] *Id*.

[37] *Id*. at 588.

[38] *Id*.

[39] *Id*. 588–89.

[40] *Id*. at 589.

[41] *Id*.

members of McGraw's office.[42] BGB attempted to depose Ms. Allen and sought to discover her interview notes and other documents.[43] Ms. Allen asserted that the interview notes and the documents were privileged and her work product.[44] The district court held that the notes and documents were not protected and ordered disclosure.[45] On appeal, the Fourth Circuit concluded that Ms. Allen had an attorney-client relationship with McGraw's office and that, under *Upjohn*, her communications with the office's employees were privileged.[46] However, one of the individuals interviewed by Ms. Allen was a former employee of the office.[47] The Fourth Circuit held that the analysis of *Upjohn* should be extended to former employees and that Ms. Allen's communications with the former employee were entitled to the privilege.[48] The court relied on four specific factors that it held supported the application of the privilege: (1) the former employee had been employed in McGraw's office during the period relevant to Ms. Allen's investigation; (2) the former employee possessed knowledge relevant to Ms. Allen's investigation; (3) Ms. Allen interviewed the former employee at the direction of her client; and (4) the purpose of the interview was to enable Ms. Allen to provide legal advice to her client.[49]

---

[42] *Id*. at 590.

[43] *Id*.

[44] *Id*.

[45] *Id*.

[46] *Id*. at 603.

[47] *Id*. at 605.

[48] *Id*. at 606.

[49] *Id*.

In light of *Turner*'s reliance on *In re Allen* and the Burger concurrence, this Court concludes that the Louisiana Supreme Court would recognize the existence of a privilege between counsel for a corporation and a former employee of the corporation, at a minimum, where (1) the former employee was employed by the corporation during the time relevant to the attorney's current representation of the corporation, (2) the former employee possesses knowledge relevant to the attorney's current representation of the corporation, and (3) the purpose of the communication is to assist the attorney in "(a) evaluating whether the employee's conduct has bound or would bind the corporation; (b) assessing the legal consequences, if any, of that conduct; or (c) formulating appropriate legal responses to actions that have been or may be taken by others with regard to that conduct."[50]

In light of this conclusion, the Court cannot say that the Magistrate Judge was clearly erroneous in holding that the conversations at issue are privileged. Both Mr. Maginnis and Mr. Cavallo were employed with their respective former employers during the construction of the community center. Not only did they both have knowledge of the construction project, but they were among the most important individuals associated with the project. Finally, it is also clear that they both spoke with the corporate attorneys in order to enable the attorneys to defend against this litigation. Therefore, the Court concludes that the Magistrate Judge correctly found that the communications were privileged.

There is one additional matter before the Court. The Parish contends that,

---

[50] *Upjohn*, 449 U.S. at 403 (Burger, C.J., concurring).

even if the pre-deposition conversations between Mr. Maginnis, Mr. Cavallo, and counsel for their respective former employers are privileged, the Parish is nonetheless entitled to know what documents the witnesses reviewed in preparation for their depositions pursuant to Federal Rule of Evidence 612. Catco and Seizler, Thompson, Brown contend that the documents are protected from disclosure by the work-product privilege.

Rule 612 affords a party certain options when an adverse witness uses a writing to refresh his memory. It is important, however, to note that the rule does not apply uniformly without regard to when the witness's memory is refreshed. Rather, when a witness uses a writing to refresh his memory prior to testifying, the adverse party may only avail itself of Rule 612 "if the court decides that justice [so] requires."[51]

Here, the witnesses were shown the documents prior to testifying. Therefore, the Parish must convince this Court that justice requires the documents be produced to the Parish. The Parish has not met this burden. The Parish's primary justification for requesting the documents is based on a theory that some witnesses may have learned facts for the first time just prior to their deposition. Essentially, the Parish argues that it is important to know when a witness learned certain facts about which he testifies. However, the Court is not convinced that the Parish needs the entire list of documents shown to the witness prior to the deposition in order to answer that question. Rather, the Parish is free to ask a witness when he first learned about certain facts.

[51] Fed. R. Evid. 612 (a)(2). *See also Burns v. Exxon Corp.*, 158 F.3d 336, 343 (5th Cir. 1998).

Additionally, the Court is convinced that the identity of any documents shown to the witness by counsel is, under the peculiar facts of this case, protected by the work-product privilege. According to counsel for the parties, over 20,000 documents have been produced in written discovery. Where, as here, an attorney culls through a large volume of documents and identifies those that she believes are important to the litigation, that selection of documents necessarily reveals the attorney's opinions regarding the litigation.[52] Thus, asking a witness to identify all the documents that he was shown by the corporate attorney prior to the deposition necessarily asks the witness to reveal the thoughts and opinions of the corporate attorney. Given that opinion work product enjoys a near absolute protection, the Court has no difficultly holding that the identity of the documents is protected.[53]

**CONCLUSION**

For the foregoing reasons, the Motion to Appeal is DENIED.

New Orleans, Louisiana, this 10th day of February, 2015.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

[52] *In re Allen*, 406 F.3d at 608.

[53] *See In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982). Of course, nothing in this order would prevent counsel from asking a deponent when they first saw a given document, or whether a document was reviewed by the deponent prior to the deposition.